IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT CHENCINSKI, JR., #B75443, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  09–cv–658–SCW |
| | ) | |
| WEXFORD U.R., DR. ALFONSO DAVID, | ) | |
| and GINA SHAFFER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### I.  Introduction

Before the Court is a motion for summary judgement filed by Defendants Dr. Alfonso David, Gina Shafer, and Wexford Health Services, Inc. (Docs. 100 & 101). Specifically, Defendants contend that they are entitled to summary judgment on Plaintiff's claims of deliberate indifference against them because Plaintiff did not suffer from a serious medical condition and none of the Defendants acted with deliberate indifference.  Plaintiff has filed a Response to Defendant's motion (Doc. 103).  Based on the following, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment.

### II.  Factual Background

The events which form the basis of Plaintiff's Complaint occurred while he was incarcerated at Shawnee Correctional Center.  Plaintiff was incarcerated at Shawnee from January 2008 to sometime in 2011.  After being sent to Shawnee, Plaintiff complained to the nurse on February 11, 2008 that he was having issues with his left eye (Doc. 101 Ex. 1 at p. 17).  Plaintiff was referred to an

outside doctor, Dr. Fix, and met with Dr. Fix on May 22, 2008 (*Id.*).  At that time, Dr. Fix diagnosed Plaintiff with blepharospasm and recommended that he be referred to outside care for botox injections (*Id.* at pp. 17-18).

Blepharospasm is an eye condition which is manifested in "uncontrollable, forcible closure of the eyelids." (Doc. 103 Ex. 1 at ¶ 4).  A severe form of the condition can cause the eyelid to forcibly close for longer than normal, interrupting vision and, as the condition progresses, can leave the eyelid shut and eyebrow pulled down (*Id.* at ¶¶ 5-6).  According to Dr. Umana, a board certified ophthalmologist who ultimately provided Plaintiff with his botox treatment and with whom Dr. David consulted, botox injections are the most effective form of treatment for blepharospasm and the use of seizure medicine such as Depakote and Klonopin (or Clonopin) are not effective treatments (*Id.* at ¶¶ 7-9).  Botox injections are required every three to four months and a course of injections can cause continued relief (*Id.* at ¶10).  Without such injections,  a patient suffering from the condition would have increasing problems keeping his eye open and seeing out of the affected eye, and ultimately the condition would affect a patient's every day life (*Id.* at ¶¶ 11-12).

After Dr. Fix made his recommendation, Dr. Alfonso David, the medical director at Shawnee Correctional Center and a Defendant in this case, reviewed Dr. Fix's diagnosis and recommended treatment and ultimately denied the proposed treatment (Doc. 101 Ex. 1 at p. 18).  Dr. David indicates that he denied the botox treatment because it was merely cosmetic and would not be a permanent treatment for Plaintiff's condition.

Dr. David did not see Plaintiff in person until June 2, 2008, at which time he denied Plaintiff botox treatment (*Id.* at p. 19-20).  Dr. David then had a follow-up appointment with Plaintiff on July 1, 2008 at which time he referred Plaintiff again to Dr. Fix.  At the July 1 visit, Dr. David also reviewed Plaintiff's history and discovered that Plaintiff had previously been treated by a neurologist

at the Cook County Hospital who had recommended botox injections for Plaintiff (*Id.* at pp. 21, 52). Plaintiff saw Dr. Fix again on July 13, 2008 and again Dr. Fix recommended botox injections as treatment for his blepharospasm (*Id.* at p. 22). Dr. David again denied the recommended treatment

Dr. David next saw Plaintiff on October 13, 2008. At that visit, Dr. David noted that Plaintiff suffered from "left heavy facial spasm" (*Id.* at p. 23). He also received Plaintiff's file from Cook County and noted that the neurologist had recommended botox injections to treat Plaintiff (*Id.*). In response to Dr. David's meeting with Plaintiff, he recommended Plaintiff to an outside neurologist and on October 30, 2008 Plaintiff met with Dr. Alam (*Id.*; Doc. 103 Ex. 5-2 at p. 2). Dr. Alam recommended that Plaintiff be treated with Depakote and, if that did not work, Dr. Alam recommended the consideration of botox injections (*Id.* at pp. 22-23; Doc. 103 Ex. 5-2 at pp. 3-4).

Dr. David approved the treatment with Depakote, an anti-seizure medication, and prescribed the medicine for Plaintiff's blephasospasm (*Id.* at p. 24). Dr. David indicated that such recommendations from an outside specialist, are just that, a recommendation, which Dr. David can either agree with and prescribe the proposed treatment or not prescribe (*Id.* at pp. 26-27). However, Dr. David noted that if the treatment was unusual, he would have to not only approve the treatment but seek approval from the Wexford Collegial Review (*Id.* at pp. 26-28). Plaintiff was prescribed Depakote and on either November 2 or 3 of 2008, Dr. David noted that Plaintiff complained the Depakote was not working, even though Dr. David stated that Plaintiff could not have been taking the medicine for more than one day at that time (*Id.* at p. 30). Dr. David also scheduled a CT scan and EEG for Plaintiff, based on Dr. Alam's recommendation, which came back normal (*Id.* at pp. 30, 56). Plaintiff followed up with Dr. Alam on December 11, 2008 regarding those tests (*Id.*). Dr. Alam recommended that Plaintiff be referred to Dr. Umana for botox injections (*Id.* at p. 31; Doc. 103 Ex. 5-2 at p. 5).

After visiting with Dr. Alam, Plaintiff again saw Dr. David on December 17, 2008 (*Id.*). Dr. David reviewed Dr. Alam's recommendations and informed Plaintiff that he would seek approval from Wexford for botox treatments as Dr. Alam suggested (*Id.*).   Plaintiff points out that even though Dr. Alam recommended botox, Dr. David continued to try to prescribe Depakote after Plaintiff saw Dr. Alam and that is when Plaintiff started refusing to take Depakote (Doc. 103 Ex. 5-2 at p. 5).  Dr. David noted that he would seek approval for botox from the Collegial Review (Doc. 101 Ex. 1 at pp. 31-32).

The Wexford Collegial Review, or specifically Dr. Dennis Larson, denied the treatment, determining that the risk of injecting toxins outweighed any temporary reduction in symptoms (*Id.* at pp. 32-35).  However, while Dr. David noted in his December 17, 2008 visit with Plaintiff that he would recommend botox treatment, he admitted in his deposition that he believed the use of botox was temporary and cosmetic and he believed that Plaintiff did not need botox (*Id.* at pp. 35-36, 61).[1]  He admitted that he agreed with Dr. Larson's decision to deny Plaintiff botox treatment (*Id.* at p. 63).  Dr. David included in his consideration to the Collegial Review that Plaintiff rarely presented with symptoms when Dr. David saw him and that Plaintiff admitted the spasms were only occasional and not constant (*Id.* at p. 64).  Plaintiff again saw Dr. David on January 19, 2009, and he informed Dr. David that he would not take Depakote any longer as Dr. Alam had told him it was not working (Doc. 103 Ex. 5-2 at p. 7).

Plaintiff did not complain again of his eye problems until September 22, 2010 when he

---

[1]  Dr. David stated that while he personally did not believe botox would be beneficial for Plaintiff, he was willing to and actually did recommend the use of botox as treatment for Plaintiff's condition to Wexford.

complained of suffering from depth perception issues (Doc. 101 Ex. 1 at p. 40).[2]  Dr. David noted that

Plaintiff had been admitted to the infirmary for other reasons during the time period between January

2009 to September 2010, but did not complain about eye problems on those occasions (*Id.* at pp. 65-66).

Plaintiff indicates that he can only put in sick call for one condition and he felt that Dr. David knew

what was wrong with his eye, so there was no reason to continue complaining about his condition when

he had gone through all the procedures for dealing with his eye problem, including visiting the doctor

and filing grievances (Doc. 103 Ex. 5-2 at pp. 14-15).

        Plaintiff was referred to optometrist Dr. Brush on October 12, 2010 and Dr. Brush

prescribed glasses for Plaintiff and recommended Clonopin, a medication used to treat seizures and

psychiatric conditions, for Plaintiff's condition but noted that botox should be used if the prescription

did not resolve the issue (Doc. 101 Ex. 1 at pp. 40-41, 68).  Dr. David also consulted with Dr. Umana

about Plaintiff's depth perception problems and was informed that blepharospasm did not cause depth

perception problems (*Id.* at pp. 67-68).  Plaintiff agreed to try the Clonopin (Doc. 103 Ex. 5-3 at pp. 3-

4).  On December 27, 2010, Plaintiff again saw Dr. David and noted that the Clonopin was not helping

his condition (Doc. 101 Ex. 1 at p. 41).  Based upon this visit, Dr. David completed a summary of

Plaintiff's treatment, completed on December 29, 2010, noting both Dr. Fix's and Dr. Alam's

recommendation for botox (*Id.* at p. 38).  This time Dr. David recommended the use of botox as

treatment because the other medications were not remedying the condition (*Id.* at pp. 44-45).  Dr. David

noted that he did not believe the treatment of blepharospasm with drugs such as Clonopin or Depokote

---

        [2]  Plaintiff notes that he had written a grievance because he was on the top bunk in his cell
and the cell lacked a ladder for him to reach the top bunk.  Plaintiff had hit his elbow and was sent
to the doctor.  Plaintiff didn't recall saying he suffered from depth perception issues but did inform
Dr. David that he was continuing to have trouble with his eye (Doc. 103 Ex. 5-3 at pp.1-2).  Plaintiff
believes he was probably having an issue with depth perception but didn't really understand the
proper terminology as he just knew he was having trouble with his twitching eye (id.).

were short term solutions, as some patients due respond to prescription treatment, but he admitted that the medications would not cure the twitching (*Id.* at pp. 49-50). He admitted that the drugs would not cure the underlying condition, but also noted that botox wouldn't cure the underling condition either (*Id.* at p. 50). Dr. David also maintains that in all of the times he saw Plaintiff, Plaintiff never complained of pain, double vision, depth perception problems, blurred vision, headaches, or problems with accessing the facilities, work, or education (*Id.* at pp. 50 -61). Plaintiff insists he informed Dr. David of problems brushing his teeth, reading, and writing, although he admits he never complained about double vision, blurred vision, headaches, or other problems associated with his eye (Doc. 103 Ex. 5-3 at p. 2).

The report prepared by Dr. David was again submitted to the Wexford Collegial Review, but this time to Dr. Rod Agrawal (Doc. 101 Ex. 1 at p. 42). The treatment was approved and Plaintiff received botox injections on February 7, 2011 and then again on May 25, 2011 (*Id.* at p. 37). Plaintiff met with Dr. Brush two weeks after the treatment and noted that Plaintiff's vision was now 80 to 85 percent because the spasms were not occurring as much (Doc. 103 Ex. 5-3 at p. 8). After his treatment, Plaintiff was transferred the another prison.

Plaintiff's Complaint also alleges that Nurse Gina Shaffer, the Director of Nursing at Shawnee, was also deliberately indifferent to Plaintiff's eye condition. Nurse Shaffer implemented policies and procedures on how the nurses in the prison operated (Doc. 101 Ex. 2 at pp. 11-12). Nurse Shaffer, in her role as Director of Nursing, did not provide direct care to inmates nor did she treat Plaintiff in any manner (*Id.* at pp. 16-18). Instead, for her role in this case, Nurse Shaffer responded orally and in writing to a counselor reviewing one of Plaintiff's grievances regarding his eye which had been delivered to her (*Id.* at pp. 21-22). Nurse Shaffer noted in her response that upon review of Plaintiff's charts, "continue conservative management means to continue treatment that presents a

decreased risk of complications.  Information provided states concerns for risks of infection of toxins outweighs the temporary reduction of symptoms." This information came directly from Plaintiff's chart according to Shaffer (*Id.* at pp. 24-25).  Nurse Shaffer never met with or evaluated Plaintiff, but rather just read his medical files in order to answer the grievance.

### III.   Summary Judgment Standard

Under **FEDERAL RULE OF CIVIL PROCEDURE 56©**, summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)**. *See also Ruffin-Thompkins v. Experian Information Solutions, Inc.,* **422 F.3d 603, 607 (7th Cir. 2005)**.  The burden is upon the moving party to establish that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, **398 U.S. 144, 160 (1970).** *See also Lawrence v. Kenosha County*, **391 F.3d 837, 841 (7th Cir. 2004)**.  A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986);** *Ballance v. City of Springfield, Illinois Police Department*, **424 F.3d 614, 616 (7th Cir. 2005);** *Hottenroth v. Village of Slinger*, **388 F.3d 1015, 1027 (7th Cir. 2004)**.  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, **371 F.3d 928, 935 (7th Cir. 2004)**. *See also Anderer v. Jones*, **385 F.3d 1043, 1064 (7th Cir. 2004).**

The inquiry performed is the threshold inquiry of determining whether there is the need for a trial, whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

[T]his standard mirrors the standard for a directed verdict under **FEDERAL RULE OF CIVIL PROCEDURE 50(a)**, which is that the trial judge must direct a verdict if, under

the governing law, there can be but one reasonable conclusion as to the verdict.

*Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 250 (1986).** *See also Celotex Corporation v. Catrett*, **477 U.S. 317, 322-23 (1986);** *Packman v. Chicago Tribune Co.*, **267 F.3d 628, 637 (7th Cir. 2001);** *Sybron Transition Corporation v. Security Insurance Company of Hartford*, **107 F.3d 1250, 1255 (7th Cir. 1997).**

A showing of a mere factual disagreement between the parties is insufficient, the factual issue must be "material," meaning that the issue must be one affecting the outcome of the suit. *See Outlaw v. Newkirk*, **259 F.3d 833, 837 (7th Cir. 2001)**. A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, **477 U.S. at 323**. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## IV.  Analysis

Defendants David, Shaffer, and Wexford Health argue that they are entitled to summary judgment on Plaintiff's deliberate indifference claim against them because Plaintiff did not suffer from a serious medical condition and because Plaintiff has not shown that Defendants were deliberately indifferent to Plaintiff's eye problems. The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (quoting** *Gregg v. Georgia*, **428 U.S. 153, 173 (1976))**. In order to prevail on such a claim, a plaintiff must first show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, **414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).** The following circumstances could constitute a

serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, **546 F.3d 516, 522-23 (7th Cir. 2008) (quoting** *Gutierrez v. Peters*, **111 F.3d 1364, 1373 (7th Cir. 1997)).** *See also Foelker v. Outagamie County*, **394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").**

The second prong of the deliberate indifference analysis requires that a prisoner show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle* **v. Gamble, 429 U.S. 97, 104 (1976) (quoting** *Gregg v. Georgia*, **428 U.S. 153, 173 (1976)**. "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, **780 F.2d 645, 652-53 (7th Cir. 1985)**. Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id*. **at 653;** *Shockley v. Jones*, **823 F.2d 1068, 1072 (7th Cir. 1987)**. Put another way, the Plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"and that the officials actually drew that inference. *Greeno*, **414 F.3d at 653.** "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,... and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, **511 U.S. 825, 842 (1994) (citations omitted)**. A plaintiff does not have to prove that his

complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008) (quoting** *Sherrod v. Lingle*, **223 F.3d 605, 611 (7th Cir. 2000)).**  The Seventh Circuit has noted that the standard is "a high hurdle..because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Roasrio v. Brawn*, **670 F.3d 821-22 (7th Cir. 2012) (***Collins v. Seeman*, **462 F.3d 757, 762 (7th Cir. 2006)).**  "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010) (quoting** *Farmer*, **511 U.S. at 843).**

## A.     Serious Medical Condition

Defendants argue that they are entitled to summary judgment because Plaintiff did not suffer from am objectively serious medical condition.  Specifically, Defendants point to the fact that Plaintiff never complained of problems such as pain, headaches, blurred or double vision, or depth perception issues, nor did he complaint about his eye twitches affecting his ability to perform jobs or interfere with his daily life, to show that his condition was not serious enough that, if left untreated, the condition would cause him pain and suffering.  An objectively serious medical condition is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Johnson v. Snyder*, **444 F.3d 579, 584-85 (7th Cir. 2006) (citing** *Zentmyer v. Kendall County*, **220 F.3d 805, 810 (7th Cir. 2000));** *Oritz v. Webster,* **655 F.3d 731, 734 (7th Cir. 2011) (citing** *Roe v. Elyea*, **631 F.3d 843, 857 (7th Cir. 2011)).**  The medical condition need not be life threatening but is a condition, that if left untreated, could result in further significant injury or pain. *Reed v. McBride*, **178 F.3d 849, 852 (7th Cir. 1999).**

Here, Plaintiff has offered ample evidence that blepharospasm is a serious medical

condition.  Plaintiff has offered an affidavit from Dr. Umana, an ophthalmologist with whom Dr. David has indicated he consulted with and who also treated Plaintiff with two rounds of botox injections in 2011.  Dr. Umana stated that blepharospasm is a serious, chronic medical condition which involves a muscle contraction in the eyelid which results in uncontrollable and forcible closure of the eyelid.  This closure lasts longer than a typical blink and causes interruption in eye sight.  If left untreated, the spasms can increase in frequency and severity, ultimately resulting in the spasm being unremitted, causing the eyelid to stay shut and the eyebrow to be pulled down.  Dr. Umana stated that if left untreated, Plaintiff would continue to suffer from the condition, causing him to have problems seeing out of his left eye, the one affected by the spasms.  Plaintiff also testified in his deposition that he has experienced some difficulties in his everyday life due to the condition.  He testified that the spasms were constant and that he has been unable to perform certain jobs because of his condition and it has interfered with his studies, requiring him to take breaks from reading during class.  Plaintiff also stated that he has had trouble brushing his teeth because the spasms cause the left side of his mouth to tighten up.  Clearly, Plaintiff has offered enough evidence that he suffers from a serious medical condition which interferes with his daily activities and which, if left untreated, could result in further injury.  Thus, the Court finds that Plaintiff has offered enough evidence to survive summary judgment on this issue.

**B.      Dr. Alfonso David**

Defendant David argues that even if Plaintiff suffered from a serious medical condition, he is entitled to summary judgment because he was not deliberately indifferent to Plaintiff's condition. Defendant David points out that Plaintiff did receive medical care from him and he did treat Plaintiff for his blepharospasm, but Plaintiff just did not agree with that treatment.  While Plaintiff wanted botox, Defendant David believed that a more conservative course of treatment was necessary, thus resulting in a mere disagreement of treatment that did not rise to the level of deliberate indifference.

However, while Dr. David argues that he was not deliberately indifferent because he chose a more conservative course of treatment after weighing the benefits and side-effects of botox treatment, Plaintiff argues that Dr. David was deliberately indifferent because he continued to deny Plaintiff botox. Plaintiff points out that Dr. David continued to deny him botox treatment even after numerous doctors recommended the treatment. Plaintiff twice saw Dr. Fix and on both occasions he recommended botox to treat Plaintiff's blepharospasm, but Dr. David denied the proposed treatment as he believed it was cosmetic and would not be a permanent treatment for Plaintiff's condition. However, Dr. Umana has stated that botox injections are actually the most effective means of treating blepharospasm and can provide continued, not just temporary, relief.

Dr. David continued to deny Plaintiff botox even after discovering that a neurologist who had previously treated Plaintiff at the Cook County Hospital recommended botox injections. Plaintiff then saw a neurologist, Dr. Alam, who recommended a prescription of Depakote but also recommended botox if the Depakote was ineffective. Plaintiff testified that even after Dr. Alam determined the Depakote was ineffective, Dr. David still tried to keep him on Depakote rather than give him the botox injections. While Dr. David ultimately did seek approval for botox injections from the Collegial Review in December 2008, Dr. David admitted that he believed Plaintiff did not need botox and agreed with the Collegial Review's decision to deny the treatment.

Here, there appears to be an issue of fact as to whether Dr. David was deliberately indifferent for refusing to treat Plaintiff with botox. While Dr. David points to facts that suggest his course of treatment was correct and the conservative course of treatment based on his own professional decision, Plaintiff points to facts that suggest Dr. David continued to ignore the proper course of treatment even when informed on numerous occasions, by numerous specialists, that botox should be given to Plaintiff. The Court finds this to be a close issue. While a jury could certainly find that this was

just a difference of opinion on the course of treatment, taking all the facts in the light most favorable to the Plaintiff, a jury could also find that Dr. David's response was so inappropriate that it constituted an intentional and reckless disregard for Plaintiff's need for botox. In any event, there is enough contradictory evidence to survive summary judgment and proceed to trial. Thus, the Court **DENIES** Dr. David's motion for summary judgment.

## C.    Gina Shaffer

Defendant Shaffer also maintains that she is entitled to summary judgment on Plaintiff's deliberate indifference claims because she did not treat Plaintiff or have any hand in his treatment. Defendant Shaffer was the Director of Nurses at Shawnee Correctional Center while Plaintiff was housed there. As the Director of Nurses, Defendant Shaffer was in charge of all aspects of the health facility and made decisions on the daily operation of the health unit in order that the facility ran smoothly. For instance, she made policy and procedures for how medical charts were kept and how discharging was planned. She did respond to grievances by reviewing inmate's medical charts and noting doctor's orders. However, she did not provide direct care to inmates or saw inmates for health concerns.

Plaintiff argues that Defendant Shaffer was deliberately indifferent because she simply responded to Plaintiff's grievance and did not change his course of treatment. Defendant Shaffer was the Director of Nurses and oversaw all aspects of the health facility's day to day operations. She did not treat patients. A person can not be held liable under **42 U.S.C. § 1983** for respondeat superior. *Gayton v. McCoy*, **593 F.3d 610, 622 (7th Cir. 2010) (citing** *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, **260 F.3d 602, 619-20 (7th Cir. 2001)).** In other words, there is no such thing as "supervisory liability" under § 1983. *See Vinning-El v. Evans*, **657 F.3d 591, 592 (7th Cir. 2011).** Instead, an individual can only be held liable for his or her own personal actions and their own

knowledge, and they are not liable for the knowledge or action of those individuals whom they supervise. *Id*.; *Burks v. Raemisch*, **555 F.3d 592, 594 (7th Cir. 2009).**  There is nothing in the record that suggests that Defendant Shaffer was personally involved in Plaintiff's care.  In fact, she did not have any involvement with patients, or Plaintiff in particular, other than to respond to grievances by reviewing the medical charts and noting the treatment plan.  She did not treat inmates or provide any sort of care to patients.  Instead, it appears that Defendant Shaffer was in charge of administrative procedures and the nurses, and did not have any personal involvement in Plaintiff's care or course of treatment.

While Plaintiff cites to the case *McCue v. Aldridge*, **2007 WL 2570380, * 17, No. 3:05-cv-554-DRH (S.D. Ill. Sept. 4, 2007)**, to support his position that Defendant Shaffer can be held liable for deliberate indifference, in that case the plaintiff had alleged that a nurse, who was also a prison administrator, had specifically ordered that the inmate not be allowed to see the doctor for his injury. In this case, Defendant Shaffer had no such involvement in Plaintiff's health care.  There is no indication that Defendant Shaffer denied Plaintiff treatment, was the gate-keeper in any fashion preventing him from getting medical treatment, or was involved in any way in the course of treatment prescribed for Plaintiff.  Thus, the Court **FINDS** that there is no evidence that Defendant Shaffer was deliberately indifferent and, thus, she is entitled to summary judgment.

**D.     Wexford Health Services, Inc.**

Defendant Wexford also argues that it is entitled to summary judgment because it did not have a policy or practice that caused a constitutional deprivation.  Wexford can be held liable for deliberate indifference to Plaintiff's medical care only if it maintained a policy or custom that violated Plaintiff's rights.  *See Minix v. Canarecci*, **597 F.3d 824, 832 (7th Cir. 2010) (corporations that contract with prison and jail facilities to provide medical care are treated as municipalities for**

purposes of § 1983); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("municipality may be liable for harm to persons incarcerated under its authority 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of prisoners.'").  Such a policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Minix*, 597 F.3d at 832.  In other words, the corporation can be held liable when the implementation of the policy or custom inflicts an injury on the plaintiff. *Woodward v. Correctional Medical Services of Illinois, Inc*., 368 F.3d 917, 927 (7th Cir. 2004).

Plaintiff can show that the policy or practice was the direct cause by showing that the policy itself violates the constitution.  *Minix*, 597 F.3d at 832.  Further, if a plaintiff can't point to an unconstitutional policy, the plaintiff also can show that the corporation was deliberately indifferent by showing "'a series of bad acts' creating an inference that...officials were aware of and condoned the misconduct of their employees." *Id*. (citing *Novack*, 226 F.3d at 531); *Woodward*, 368 F.3d at 927. A corporation, however, can *not* be held liable under a theory of respondeat superior and thus can not be held liable for the actions of its employees. *Woodward*, 368 F.3d at 927.

Here, Plaintiff has failed to point to any policy or custom of Wexford's that he argues is unconstitutional.  Plaintiff points out that under Wexford Prison Operations Policies and Procedures, Wexford's medical staff is to ensure timely and efficient response's to inmate medical needs (Doc. 103 Ex. 2).  Further, non-emergency requests by inmates, under the policy, are to be "triaged" by qualified health care staff within 24 hours and any acute or chronic medical conditions are to be noted and continuation of treatment is to be provided (*Id*.).    While Plaintiff has offered several policies of Wexford, he has failed to show how any of the medical staff involved in his treatment acted pursuant to a policy or widespread custom of Wexford's which caused Plaintiff's injuries.  In fact, none of the policies Plaintiff points to appear to be the cause of Plaintiff's injuries, nor are they unconstitutional.

The policies, instead, direct that an inmate is to get adequate and timely care from the medical staff. None of these policies, directing timely medical care, could be the cause of Plaintiff's injuries.

Nor has Plaintiff pointed to any evidence that Wexford was aware of or acquiesced in any wrongful conduct by the medical staff. While Plaintiff points out that Wexford's review board denied Plaintiff botox treatments, the evidence reveals that the Collegial Review board actually consisted of only one doctor who would review the medical staff's request and would approve or deny the proposed treatment. This was done by another doctor working at another Wexford facility. There is no evidence that Wexford itself participated in the decision making process or approved of the course of treatment used. Thus, as Plaintiff has not pointed to any evidence which would create an issue of material fact that a practice or policy of Wexford cause Plaintiff's injuries, nor is there any evidence that Wexford encouraged or acquiesced in Plaintiff's treatment, the Court finds that Wexford is entitled to summary judgment on Plaintiff's deliberate indifference claim.

## V.  Conclusion

The Court, therefore, **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment on Plaintiff's claim against them for deliberate indifference. Specifically, the Court **GRANTS** summary judgment as to Wexford and Nurse Gina Shaffer. However, the Court **DENIES** summary judgment as to Dr. Alfonso David. Thus, the only claim which remains for trial is Plaintiff's claim against Dr. David for deliberate indifference.

IT IS SO ORDERED.

DATED: June 28, 2012.

/s/*Stephen C. Williams*
STEPHEN C. WILLIAMS
United States Magistrate Judge